THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JASON AUCKER,                          :
                                       :
          Plaintiff                    :
                                       :          3:13-CV-02019
     vs.                               :
                                       :          (Judge MARIANI)
CAROLYN W. COLVIN, ACTING              :
COMMISSIONER OF SOCIAL                 :
SECURITY,                              :                    FILED
                                       :                 SCRANTON
          Defendant                    :
                                                        NOV 1 3 2014

                    MEMORANDUM              PER ⎯⎯⎯⎯⎯⎯⎯⎯⎯
                                                        DEPUTY CLERK

Background

          The above-captioned action is one seeking review of a decision of the

Commissioner of Social Security ("Commissioner") denying Plaintiff Jason Aucker's claim

for social security disability insurance benefits and supplemental security income

benefits.

          On February 11, 2011, Aucker filed protectively[1] an application for disability

insurance benefits and an application for supplemental security income benefits. Tr. 12,

59-60, 132-135 and 141.[2]   The applications were initially denied by the Bureau of

Disability Determination[3] on July 15, 2011. Tr. 71-79.  On August 22, 2011, Aucker

requested a hearing before an administrative law judge which was held on February 14,

---

1.    Protective filing is a term for the first time an individual contacts the Social Security
Administration to file a claim for benefits.  A protective filing date allows an individual to
have an earlier application date than the date the application is actually signed.

2.    References to "Tr.__" are to pages of the administrative record filed by the
Defendant as part of the Answer on November 12, 2013.

3.    The Bureau of Disability Determination is a state agency which initially evaluates
applications for disability insurance and supplemental security income benefits on
behalf of the Social Security Administration.  Tr. 81 and 85.

2012. Tr. 12, 130-131 and 26-57. Aucker was represented by counsel at the hearing. Tr. 26-57. Aucker alleged that he became disabled on December 31, 2007, because of bipolar depression, a learning disorder and mood swings. Tr. 132 and 145. He further claimed that he met Listing 12.05C for intellectual disability because he had a full scale IQ score of 65 and other mental impairments imposing additional and significant work-related limitation of functions.[4] Tr. 32; Doc. 13, Plaintiff's Brief, p. 1-4. During the administrative hearing Aucker's counsel stated that Aucker was not claiming that he suffered from physical issues which would prevent him from engaging in substantial gainful activity.[5] Tr. 32. On February 24, 2012, the administrative law judge issued a decision denying Aucker's applications. Tr. 12-22. As will be explained in more detail *infra* the administrative law judge found that Aucker failed to prove that he met the

---

4. The requirements of Listing 12.05C in relevant part are as follows:

> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

> The required level of severity for this disorder is met when the requirements in . . . C . . . are satisfied.

> \* \* \* \* \* \* \* \* \* \* \*

> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

5. Aucker did state that he needed to wear eye glasses to read but there is no medical evidence in the administrative record indicating that he had a vision problem which would prevent him from engaging in work activity. Tr. 37. Also, in March of 2011 Aucker completed a document entitled "Function Report - Adult" in which he stated he had problems with lifting, squatting, bending, standing, reaching and walking and that he had pain in his knees but when asked at the administrative hearing what prevented him from working he only mentioned his mental impairments and his vision. Tr. 37-39 and 158. Oddly, however, Aucker in the "Function Report - Adult" when asked to check "items that [his] illnesses, injuries or conditions affect" did not check seeing, kneeling or stair climbing. Tr. 158.

2

requirements of a listed impairment or suffered from work-preclusive functional

limitations.  Id.  Instead the administrative law judge found that Aucker had the ability to

perform work at all exertional levels[6] but with several mental functional limitations and

even with those limitations he could perform his past relevant unskilled, very heavy work

---

6.    The terms sedentary, light, medium, heavy and very heavy work are defined in the
regulations of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10
> pounds at a time and occasionally lifting or carrying articles like docket
> files, ledgers, and small tools.  Although a sedentary job is defined as one
> which involves sitting, a certain amount of walking and standing is often
> necessary in carrying out job duties.  Jobs are sedentary if walking and
> standing are required occasionally and other sedentary criteria are met.
>
> (b) *Light work*.  Light work involves lifting no more than 20 pounds at a
> time with frequent lifting or carrying of objects weighing up to 10 pounds.
> Even though the weight lifted may be very little, a job is in this category
> when it requires a good deal of walking or standing, or when it involves
> sitting most of the time with some pushing and pulling of arm or leg
> controls.  To be considered capable of performing a full or wide range of
> light work, you must have the ability to do substantially all of these
> activities.  If someone can do light work, we determine that he or she can
> also do sedentary work, unless there are additional limiting factors such
> as  loss of fine dexterity or inability to sit for long periods of time.
>
> (c) *Medium work*.  Medium work involves lifting no more than 50 pounds at
> a time with frequent lifting or carrying of objects weighing up to 25 pounds.
> If someone can do medium work, we determine that he or she can do
> sedentary and light work.
>
> (d) *Heavy work*.  Heavy work involves lifting no more than 100 pounds at a
> time with frequent lifting or carrying of objects weighing up to 50 pounds.
> If someone can do heavy work, we determine that he or she can also do
> medium, light, and sedentary work.
>
> (e) *Very heavy work*.  Very heavy work involves lifting objects weighing
> more than 100 pounds at a time with frequent lifting or carrying of objects
> weighing 50 pounds or more.  If someone can do very heavy work, we
> determine that he or she can also do heavy, medium, light and sedentary
> work.

20 C.F.R. § 416.967.

as an asphalt laborer.[7] Tr. 18 and 21. On April 24, 2012, Aucker filed a request for review with the Appeals Council. Tr. 7-8. After the passage of over 13 months, the Appeals Council on June 4, 2013, concluded that there was no basis upon which to grant Aucker's request for review. Tr. 1-3. Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Aucker then filed a complaint in this court on July 26, 2013. Supporting and opposing briefs were submitted and the appeal[8] became ripe for disposition on February 6, 2014, when Aucker filed a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Aucker met the insured status requirements of the Social Security Act through March 31, 2013. Tr. 12 and 14.

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind or other disabled individuals who have little or no income. Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

---

7.     Past relevant employment in the present case means work performed by Aucker during the 15 years prior to the date his claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565.

8.     Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

Aucker was born in the United States on September 8, 1981, and at all times relevant to this matter was considered a "younger individual"[9] whose age would not seriously impact his ability to adjust to other work. 20 C.F.R. §§ 404.1516(c) and 416.963(c). Tr. 41, 85-86, 155 and 159.

In a document filed with the Social Security Administration, Aucker stated that he graduated from high school in 2000 and can and can read, write, speak and understand the English language. Tr. 144 and 146. During his elementary and secondary schooling, Aucker attended special education classes. Id. He also reported that he completed vocational training in auto mechanics. Id. At the administrative hearing Aucker testified that he was a licensed driver and that he drove one hour to Lewistown, Pennsylvania, to attend the hearing. Tr. 33-34. When he was asked whether he could read and write he responded by stating "barely" but admitted that he could read "some of" the street signs. Tr. 34. The administrative record reveals at least one document which was completed and signed by Aucker in legible handwriting. Tr. 181-187

Aucker's work history covers 10 years and at least 5 different employers. Tr. 136-140, 146, 166-173 and 203. The records of the Social Security Administration reveal that Aucker had earnings in the years 1999 through 2008. Tr. 140. Aucker's total earnings during those 10 years were $160,953.56. Id. In 1999, Aucker worked for Bucknell University earning a total of $494.64. Tr. 136. The record does not reveal the type of work Aucker performed. During 2000 Aucker worked for Truck Group Accessories Group, LLC, a manufacturer of truck windows and doors; Bucknell University; and Pep Boys. Tr. 36 and 136. Aucker's total earnings during 2000 were

---

9. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). At the time of the administrative hearing Aucker 30 years old. Tr. 33.

5

$6893.05. Tr. 136. During 2001 through 2003 Aucker again worked for Truck Group Accessories Group, LLC, earning $16,509.29, $17,795.01 and $13,115.48, respectively; during 2004 Aucker worked for Creation Windows, Inc., a manufacturer of windows for motor vehicles and earned $12,293.25; during 2005 Aucker worked for Dura Operating Corp., a manufacturer of motor vehicle parts and accessories, and Pennsy Supply, Inc., an asphalt supply company, earning a total for the year of $26,635.75; and during 2006, 2007 and 2008, Aucker worked for Pennsy Supply, Inc., earning $35,739.05, $29,763.28, and $1714.76, respectively. Tr. 136-137.

Aucker reported that from January, 2004 to December, 2007, he worked as a laborer in a factory on an assembly line producing truck cap doors and as a laborer for an asphalt company. Tr. 166-168. When he worked on the assembly line Aucker stated that he had to use machines, hammers and rivet guns and use technical knowledge or skills, i.e., measuring items. Tr. 167. He also stated that he worked 8 hours per day, 5 days per week and that the work required him to walk or stand 8 hours and lift up to 70 pounds and frequently lift 50 pounds. Id. With respect to the position as an asphalt laborer, Aucker reported that he worked up to 16 hours per day, 5 days per week, shoveling and rolling asphalt. Tr. 168. He indicated that he used equipment and technical knowledge or skills, i.e., driving a roller. Id. He also stated that he had to lift up to 175 pounds and frequently lift 30 pounds. Id.

A vocational expert described Aucker's past relevant employment[10] as follows: (1) an asphalt laborer described as unskilled, heavy to very heavy work, and (2)

10. Past relevant employment in the present case means work performed by Aucker during the 15 years prior to the date his claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565.

6

a laborer for a manufacturer of windows described as semiskilled, heavy work. Tr. 51-52 and 203.

According to earning records Aucker last worked in 2008 for the asphalt supply company. Tr. 14 and 137.   However, in a document filed  with the Social Security Administration in early 2011,  Aucker stated that he stopped working on December 27, 2007, because of his condition. Tr. 145.  At the administrative hearing in February, 2012, Aucker stated that he was fired because of an argument he had with his supervisor. Tr. 35-36.  In contrast, however, when Aucker was interviewed by a psychologist in September 2008, Aucker stated that his job as an asphalt laborer "ended because of a general layoff." Tr. 239.  He also reported that "[h]e was fired from the truck cap company because of his 'bad attitude' and telling his 'boss how to run the plant'" and that prior to that position he had "worked for a window manufacturing company but quit that job after two years because he wanted something better." Id.

Aucker reported that his daily activities included cleaning up around his trailer; feeding his chickens and dogs; going fishing and biking, watching TV, playing video games, using a laptop computer to play solitaire,  surfing the internet for photos of motor vehicles, learning to use the social network Facebook, and building model cars. Tr. 41-42, 157 and  239-240.  He also reported spending time working on his motor vehicle, a 1997 Chevy Blazer. Tr. 43 and 240.   At the administrative hearing when asked about social activities, he responded by stating that he does "not leave the house." Tr. 41. However, later he inconsistently testified that he drives "once or twice a day" and takes his mother grocery shopping and to doctor's appointments. Tr. 43.

At the administrative hearing, the vocational expert was asked to assume an individual of the same age, education and work experience as Aucker who had no physical exertional limitations but would be limited to simple routine tasks such that the

individual could understand, remember and carry out simple work instructions but would be unable to perform complex decision making in the workplace. Tr. 52. The individual also could tolerate no more than occasional changes in the work setting in terms of processes and products and would be required to exercise no more than simple workplace judgments and possess the capacity to stay on task for at least 90 percent of the workday on a regular and continuing basis. Id. The individual could also only have occasional interaction with the public, coworkers and supervisors. Id. The vocational expert was then asked if such an individual could perform any of Aucker's past relevant work. Id. In response to that question, the vocational expert stated that the individual could perform unskilled, heavy to very heavy work as an asphalt laborer. Id.

For the reasons set forth below we will affirm the decision of the Commissioner.

**Standard of Review**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the

Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano,

637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir.

1979).

## Sequential Evaluation Process

To receive disability benefits, the plaintiff must demonstrate an "inability to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than 12 months." 42

U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for
> work.  For purposes of the preceding sentence (with
> respect to any individual), "work which exists in the
> national economy" means work which exists in significant
> numbers either in the region where such individual
> lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability

insurance and supplemental security income claims.  See 20 C.F.R. §404.1520 and 20

C.F.R. § 416.920; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner

to consider, in sequence, whether a claimant (1) is engaging in substantial gainful

activity,[11] (2) has an impairment that is severe or a combination of impairments that is

---

11.    If the claimant is engaging in substantial gainful activity, the claimant is not
disabled and the sequential evaluation proceeds no further.

severe,[12] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[13] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[14]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity

---

12. The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2).

13. If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

14. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

11

assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**Medical Records**

      Before we address the administrative law judge's decision and the arguments of counsel, we will review in detail Aucker's medical records. There were no school records submitted to the administrative law judge[15] and there are no psychological or medical records dated prior to September, 2008, contained within the administrative record.

      On September 4, 2008, Aucker was evaluated by Nicholas E. Brink, Ph.D., a clinical psychologist, located in Coburn, Pennsylvania.[16] Tr. 239-242. The report of this evaluation reveals that Aucker drove himself to the appointment from Richfield, Pennsylvania, a distance of approximately 30 miles and was on time for the appointment. Tr. 239. A mental status examination revealed that Aucker's hygiene appeared adequate; he was able to communicate adequately and there was nothing unusual noted regarding his speech; he was neither depressed nor especially anxious and he exhibited no other emotional problems; he had no perceptual disturbances; his thought processes

---

15.   After the administrative law judge issued his decision, Aucker submitted to the Appeals Council a copy of his school transcript (grades 7 through 12) from the Milton Area School District, Milton, Pennsylvania. Tr. 236. The transcript reveals that his overall cumulative grade point average was 79.810. Id. His class rank was 130 out of 177. Id.

16.   The administrative record does not reveal that Dr. Brink had any other contact with Aucker.

were normal with nothing unusual noted regarding his thinking and he had no language

impairment; he had no specific fears or obsessions and no thought disturbances were

indicated; he was oriented to person, place and time and his remote and recent past

memory were adequate; his immediate recall was poor; with respect to impulse control

Aucker reported that he has a temper and will yell when he gets angry; and he had poor

social judgment and his insight into the nature of his problems was limited. Tr. 241-242.

Intelligence testing revealed that Aucker had a full scale IQ score of 65. Tr. 240. After

conducting the mental status examination and intelligence testing, Dr. Brink concluded

that Aucker was mildly retarded and had a learning disability in all areas but especially

mathematics. Tr. 242. Dr. Brink gave Aucker a Global Assessment of Functioning (GAF)

score of 55.[17]   Id.

_____

17.    The GAF score allows a clinician to indicate his judgment of a person's overall
psychological, social and occupational functioning, in order to assess the person's
mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th
ed. 1994). A GAF score is set within a particular range if either the symptom severity or
the level of functioning falls within that range. Id. The score is useful in planning
treatment and predicting outcomes. Id.  The GAF rating is the single value that best
reflects the individual's overall functioning at the time of examination.  The rating,
however, has two components: (1) symptom severity and (2) social and occupational
functioning.  The GAF is within a particular range if either the symptom severity or the
social and occupational level of functioning falls within that range.  When the
individual's symptom severity and functioning level are discordant, the GAF rating
reflects the worse of the two.  Thus, a suicidal patient who is gainfully employed would
have a GAF rating below 20.  A GAF score of 21-30 represents behavior considerably
influenced by delusions or hallucinations or serious impairment in communication or
judgment or inability to function in almost all areas.  A GAF score of 31-40 represents
some impairment in reality testing or communication or major impairment in several
areas,  such as work or school, family relations, judgment, thinking or mood. Id.  A GAF
score of 41-50 indicates serious symptoms or any serious impairment in social,
occupational or school functioning.  Id.  A GAF score of 51 to 60 represents moderate
symptoms or any moderate difficulty in social, occupational, or school functioning. Id. A
GAF score of 61 to 70 represents some mild symptoms or some difficulty in social,
occupational, or school functioning, but generally functioning pretty well with some
(continued...)

13

In a separate document Dr. Brink noted that Aucker had a slight limitation in
his ability to understand and remember short, simple instructions; a moderate limitation[18]
in his ability to carry out short, simple instructions; a moderate limitation in his ability to
understand and remember detailed instructions;  a marked limitation[19] in his ability to
carry out detailed instructions and make judgments on simple work-related decisions; a
slight limitations in his ability to interact appropriately with the public; and a moderate
limitation in his ability to interact appropriately with supervisors and coworkers, and
respond appropriately to work pressures in a usual work setting and to changes in a
routine work setting . Tr. 243.

The next medical record which we encounter is from December 29, 2010.
2011. On that date Aucker had an initial psychiatric evaluation performed by Muhammad
Qamar, M.D., at the Universal Community Behavioral Health Outpatient Clinic (Mifflin
County) located in Yeagertown, Pennsylvania. Tr. 268-271.  During the clinical interview
Aucker reported that he had problems with depression and anger; he had no motivation
and no desire to do anything;  and he isolates himself from others. Tr. 268.  Aucker
denied auditory and visual hallucinations and paranoia as well as suicidal and homicidal
thoughts, intent or plan. Id.  Aucker reported that the first time he saw a psychiatrist was
at age 10 when he was depressed because his parents divorced but since then he never

---

17.  (...continued)
meaningful interpersonal relationships. Id.

18.    The Social Security Administration defined moderate as follows: "There is a
moderate limitation in this area, but the individual is still able to function satisfactorily."
Tr. 254.

19.    The Social Security Administration defines marked as follows: "There is serious
limitation in this area. The ability to function is severely limited but not precluded." Id.

was evaluated by a psychiatrist and was never admitted for psychiatric treatment. Id.
Aucker reported six to seven suicide attempts apparently related to his parents' divorce.
Id. Aucker denied any active medical problems and that he "never took any
medications." Tr. 269. Aucker reported that he drinks occasionally and the last time was
the day before the evaluation. Id. He stated that he used marijuana at age 16 but no
other drugs and that he presently smokes one pack of cigarettes per day. Id.

A mental status examination performed by Dr. Qamar revealed that Aucker
was dressed and groomed appropriately; he was alert and oriented to person, place,
time and situation; his motor activity was normal; his mood was depressed and his affect
was congruent with his mood; his thought process was logical and he had no
hallucinations or paranoia; he had no capacity for harming himself or others; his insight
and judgment were fair; his capacity for activities of daily living was good; his short and
long term memory and concentration were normal;[20] and his intelligence quotient
"measured by vocabulary and general fund of knowledge" was "average."[21] Tr. 269-270.
Dr. Qamar identified Aucker's assets as average intelligence, motivation for treatment
and good communication skills. Tr. 270. Dr. Qamar's diagnostic assessment was that
Aucker suffered from a mood disorder, not otherwise specified, and he could not rule out
bipolar disorder. Id. He gave Aucker a GAF score of 60, representing the high end of the

---

20. Aucker was able to register and recall 3 out of 3 items; he correctly identified
President Obama and President Bush and his date of birth; and he was able to spell
"World" forwards and backwards. Tr. 270.

21. The average IQ score is considered 100. What is the Average
IQ?,http://psychology.about.com/od/intelligence/f/average-iq.htm (Last accessed
October 22, 2014).

moderate limitation range. Id. Dr. Qamar prescribed Navane[22] for Aucker's mood disorder and Celexa for his depression.[23] Tr. 271.

On January 26, 2011 Aucker had an appointment with Dr. Qamar at which Aucker reported that he was stable on his medications and denied suffering from depression, signs and symptoms of mania, auditory and visual hallucination, paranoia, anxiety, nervousness, and suicidal or homicidal ideations. Tr. 267. The results of a mental status examination performed by Dr. Qamar were completely normal, including Aucker's mood was fine. Id. Dr. Qamar's diagnostic assessment remained the same, including Aucker's current GAF score was 60. Id. Dr. Qamar continued Aucker on the same medications. Id.

At an appointment with Dr. Qamar on February 23, 2011, Aucker reported that he was stable on his medications, he tolerated the medications very well, and he denied any side effects. Tr. 266. He further denied suffering from depression, signs and symptoms of mania, auditory and visual hallucination, paranoia, anxiety, nervousness, and suicidal or homicidal ideations. Id. The results of a mental status examination performed by Dr. Qamar were completely normal, including Aucker's mood was fine. Id.

---

22. Navane is an antipsychotic drug used to treat schizophrenia but may be used for other conditions as determined by a physician. Navane, Drugs.com, http://www.drugs.com/cdi/navane.html (Last accessed October 23, 2014). Psychiatric side effects of Navane include bizarre nightmares involving torture, worsening of the underlying psychiatric illness and agitation. Navane Side Effects, Drugs.com, http://www.drugs.com/sfx/navane-side-effects.html (Last accessed October 23, 2014). Physical side effects can include severe muscle stiffness, slurred speech, restlessness, uncontrolled movement of arms and legs and seizures. Id.

23. Celexa is an antidepressant in a group of drugs called selective serotonin reuptake inhibitors. Celexa, Drugs.com, http://www.drugs.com/celexa.html (Last accessed October 23, 2014).

Dr. Qamar's diagnostic assessment remained the same, including Aucker's current GAF score was 60. Id. Dr. Qamar continued Aucker on the same medications. Id.

At an appointment with Dr. Qamar on March 23, 2011, Aucker reported that he was doing well on his medications but that there were times when he would get "a little bit angry, irritable, and [have] outbursts." Tr. 265. Aucker stated that the Navane had initially helped but presently did not appear to be helping. Id. The results of a mental status examination performed by Dr. Qamar were completely normal, including Aucker's mood was fine. Id. Dr. Qamar's diagnostic assessment remained the same, including Aucker's current GAF score was 60. Id. Dr. Qamar increased Aucker's dosage of Navane and continued him on Celexa and also added the drug Cogentin[24] for possible extrapyramidal symptoms (EPS).[25] Id.

On May 18, 2011, Aucker reported that he was doing well but that there were times "when he gets [a] little bit angry and has some outbursts and when he cannot focus but that he [felt] that [the] medicines [were] kicking in and he [did] not want [the] medication to be increased[.]" Tr. 264. The results of a mental status examination performed by Dr. Qamar were completely normal, including Aucker's mood was fine. Id. Dr. Qamar's diagnostic assessment remained the same, including Aucker's current GAF

---

24. Cogentin is "used to control tremor and stiffness of the muscles due to certain antipsychotic medicines[.]" Cogentin, Drugs.com, http://www.drugs.com /cdi/cogentin.html (Last accessed October 23, 2014).

25. Extrapyramidal symptoms are abnormal motor activities, including Parkinsonian symptoms, dystonia (sudden contraction and rigidity of muscles) and akathisia (a need for constant movement, e.g., rocky back and forth), associated with dysfunction in a portion of the brain referred to as the extrapyramidal system which controls involuntary reflexes and movement and coordination. See Extrapyramidal system, Chemeurope.com, http://www.chemeurope.com/en/encyclopedia/Extrapyramidal _system.html (Last accessed October 23, 2014).

score was 60. Id. Dr. Qamar noted that Aucker was doing well on his medications but wanted to increase Aucker's dosage of Navane but because Aucker declined to do so he continued the same dosage and continued Aucker on the other medications previously prescribed. Id.

On June 8, 2011, Aucker was evaluated by Matthew L. Emery, Psy.D., a clinical psychologist, on behalf of the Bureau of Disability Determination. Tr. 247-253. Dr. Emery conducted a clinical interview which revealed that Aucker drove to the appointment accompanied by his wife. Tr. 247. Aucker claimed he had a learning disability; attention deficit hyperactivity disorder; a history of trauma (i.e., exposure to domestic and physical abuse by his stepfather although he did not "significantly endorse any trauma based symptoms associated with his alleged exposure to domestic violence and physical abuse" and an automobile accident in 2003 where he reportedly hit his head); a history of "possible mood related" issues (i.e., suicide attempts and self injurious behavior); and psychotic symptoms since 2008 or 2009 (i.e., visual hallucinations and paranoid and bizarre delusions involving "shadow perceptual distortions [] coming after him in order to take him away.").[26] Tr. 247-249. Aucker reported that he smoked marijuana and consumed alcohol excessively between the ages of 14 and 16 but "claimed to have refrained from using marijuana since that time, and may only drink beer approximately once every 6 months." Tr. 250. Aucker denied any physical health conditions or ailments and stated he enjoyed fishing, hunting and camping. Tr. 249-250.

---

26. This is the first indication in the record of Aucker experiencing hallucinations. Previously when asked by Dr. Qamar he denied experiencing any hallucinations.

18

A mental status examination performed by Dr. Emery revealed that Aucker's personal hygiene was somewhat poor and he was disheveled but he did not display any atypical physical features, he was seated in a relaxed position and did not seem to be anxious; he was oriented to person, place and time; he had adequate eye contact; his gait was unremarkable; he did not display any tics, tremors or unusual mannerisms or gestures; his psychomotor activity was normal, as he did not seem to be restless or fidgety, nor was he slow or lethargic in movement; his speech appeared slow in rate, reduced in amount and monotone in quality; he gave evidence of alogia or poverty of speech[27] but did not display any apparent speech articulation problems; his mood was predominantly dysphoric[28] and apathetic and his affect appeared blunted; he reported experiencing hallucinations every night where he sees shadows; his thought process appeared to be illogical yet goal-directed and his rate of mentation (i.e., the process of reasoning and thinking) appeared to be slow; he reported experiencing recurrent suicidal ideations with a plan but denied actual intent to commit self-harm;[29] he denied any homicidal ideations; he "endorsed possible paranoid and bizarre delusions;" his remote, recent past, and recent memory seemed to be intact; he reported angry outbursts, marked by yelling or throwing objects, about once every other day but "no

---

27.    "Alogia refers to a form of speech disturbance found in schizophrenia" and "[c]an include reductions in the amount of speech (poverty of speech) or speech that does not convey meaningful information (poverty of content of speech)." Psychology Glossary, http://www.psychology-lexicon.com/cms/glossary/glossary-a/131-alogia.html (Last accessed October 23, 2014).

28.    Dysphoria is defined as "disquiet; restlessness; malaise." Dorland's Illustrated Medical Dictionary, 579 (32nd Ed. 2012).

29.    This appears to be the first time Aucker reported that he had recurrent suicidal ideations.

indication of physical aggression towards others or difficulties refraining from amorous urges;" and he had poor judgment and limited insight. Tr. 250-252. Dr. Emery stated that Aucker "appear[ed] to have below average intelligence, possibly in the Borderline range or lower" and "appeared to demonstrate poor concentration." Tr. 251-252.

Dr. Emery's diagnostic assessment was that Aucker suffered from major depressive disorder, severe, with psychotic features; attention deficit hyperactivity disorder (prior history); reading disorder (prior history); mathematics disorder (prior history); and disorder of written expression (prior history). Tr. 252. Dr. Emery could not rule out schizoaffective disorder and posttraumatic stress disorder. Id. Dr. Emery gave Aucker a current GAF score of 40. Id. He further stated that Aucker did not "appear to be capable of managing his personal funds in a competent manner[.]" Tr. 253.

In a separate document entitled "Medical Source Statement of Ability to do Work-Related Activities (Mental)," Dr. Emery stated that Aucker was moderately limited in his ability to understand, remember and carry out short, simple instructions, understand and remember detailed instructions, and respond appropriately to work pressures in a usual work setting; and markedly limited in his ability to carry out detailed instructions and make judgments on simple work-related decisions; and slightly limited in his ability to interact appropriately with the public, supervisors, and coworkers, and respond appropriately to changes in a routine work setting. Tr. 255.

On June 10, 2011, Edward Jonas, Ph.D., a psychologist, reviewed Aucker's medical records on behalf of the Bureau of Disability Determination and concluded that Aucker suffered from an affective disorder and borderline intellectual functioning. Tr. 75. He further found that Aucker had no restrictions in activities of daily living, moderate

difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence or pace. Id. Dr. Jonas concluded that Aucker did not meet the requirements of Listing 12.05 and although he had some limitations in the performance of certain work activities those limitations would not prevent him from performing his past relevant work. Tr. 75 and 79.

On August 3, 2011, Aucker had an appointment with Dr. Qamar at which Aucker reported that he was "sleeping all the time, gets angry and irritable, does not do activities, and has been gaining weight." Tr. 263. He also reported seeing shadows but denied any other problems. Id. Other than the report of visual hallucinations, the results of a mental status examination performed by Dr. Qamar were completely normal, including Aucker's mood was fine. Id. Dr. Qamar's diagnostic assessment was that Aucker suffered from a mood disorder, not otherwise specified, with psychotic features, and he could not rule out bipolar disorder. Id. He gave Aucker a current GAF score of 60. Id. Dr. Qamar discontinued the drug Celexa, prescribed the antidepressant Wellbutrin and increased the dosage of Navane and continued the prescription for Cogentin. Id.

At an appointment on August 31, 2011, Aucker reported the he was "doing good except that he [was] not sleeping good, but medicines are helping him." Tr. 262. He denied any other problems, including auditory and visual hallucinations. Id. The results of a mental status examination performed by Dr. Qamar were completely normal, including Aucker's mood was fine. Id. Dr. Qamar's diagnostic assessment was that Aucker suffered from a mood disorder, not otherwise specified, and he could not rule out bipolar disorder. Id. Aucker no longer suffered from psychotic features. Id. Dr. Qamar

21

gave Aucker a GAF score of 60. Id. Dr. Qamar noted that Aucker was doing well on his medications. Id. He added to Aucker's medication regimen trazodone for insomnia.[30] Id.

At an appointment on September 14, 2011, Aucker provided Dr. Qamar with a copy of the report of the recent evaluation performed by Dr. Emery. Tr. 261. Dr. Qamar noted that Aucker was stable on his medications except for some anxiety and he discussed with Aucker various medication options, including adding the anti-anxiety drug Vistaril to the medication regimen. Id. Other than the anxiety, Aucker denied any problems, including visual and auditory hallucinations and paranoia. Id. The results of a mental status examination performed by Dr. Qamar were completely normal, including Aucker's mood was fine. Id. Even though Aucker denied hallucination and paranoia and had a normal mental status examination, Dr. Qamar oddly adopted Dr. Emery's diagnostic assessment, including that Aucker suffered from major depression, severe, with psychotic features. Id. However, he gave Aucker a GAF score of 60 and noted that Aucker was doing better and continued the same medications but added Vistaril to Aucker's regimen because of his report of suffering from anxiety. Id.

At an appointment with Dr. Qamar on November 9, 2011, Aucker reported that he was doing better but had no focus or concentration. Tr. 259. Aucker further denied any side effect of the medications and any other problems, including auditory or

---

30. Trazodone (brand name Oleptro) is an antidepressant medication used to treat major depressive disorder. Trazodone, Drugs.com, http://www.drugs.com/ trazodone.html (Last accessed October 23, 2014). It may be used for other purposes. Id. Using trazodone and Navane together may cause difficulties with concentration as well as some impairment in thinking and judgment. Drug interactions between Navane and trazodone, Drugs.com, http://www.drugs.com/drug-interactions/navane-with-trazodone-2186-1434-2228-0.html (Last accessed October 23, 2014).

visual hallucinations. Id.  The results of a mental status examination performed by Dr.

Qamar were completely normal, including Aucker's mood was fine. Id.  Even though

Aucker denied hallucination and paranoia and had a normal mental status examination,

Dr. Qamar oddly adopted Dr. Emery's diagnostic assessment, including that Aucker

suffered from major depression, severe, with psychotic features. Id.  He gave Aucker a

GAF score of 60. Id.  Dr. Qamar continued the same medications but added Strattera[31]

and increased the dosage of Wellbutrin. Id.

       The last record we encounter is a report of an appointment Aucker had with

a new psychiatrist, Geraldine Idoniboye, M.D., at Universal Community Behavioral Health

on January 9, 2012. Tr. 257-258.  Aucker came on time for that appointment and

reported that his mood, sleep and appetite were improved. Tr. 257.  He also reported that

he was "better able to focus" with his medications. Id.  His mother who attended the

appointment reported that Aucker was very impulsive and tended to spend money

recklessly. Id.  The results of a mental status examination performed by Dr. Idoniboye

were completely normal, including Aucker's mood was fine. Id.  Dr. Idoniboye's

diagnostic assessment was that Aucker suffered from bipolar disorder, attention deficit

hyperactivity disorder, posttraumatic stress disorder, a reading disorder by history, and a

mathematics disorder by history. Id.  Dr. Idoniboye gave Aucker a current GAF score of

60. Id.  She added the drug Abilify[32] to Aucker's medication regimen. Tr. 258.

---

31.    Strattera is used to treat attention deficit hyperactivity disorder. Strattera,
Drugs.com, http://www.drugs.com/strattera.html (Last accessed October 23, 2014).

32.    Abilify, an antipsychotic medication, is used to treat, inter alia, bipolar disorder
and major depressive disorder. Abilify, Drugs.com, http://www.drugs.com/abilify.html
(Last accessed October 23, 2014).

No treating psychiatrist provided a functional assessment indicating that Aucker was unable to perform the mental requirements of unskilled work as an asphalt laborer on a sustained basis. Furthermore, no treating or examining physician stated that Aucker met the requirements of Listing 12.05C.

## Discussion

The administrative law judge at step one found that Aucker had not engaged in substantial gainful activity after December 31, 2007. Tr. 14. The administrative law judge noted that Aucker continued to work for Pennsy Supply, Inc., in 2008 but that it did not amount to substantial gainful activity because of the low earnings. Id.

At step two, the administrative law judge found that Aucker suffered from the following severe impairments: "major depressive disorder and borderline intellectual functioning (BIF)."[33] The administrative law judge concluded that Aucker's intelligence was more in line with borderline intellectual functioning than mild mental retardation but he agreed with the agency's psychological consultant, Dr. Jonas, that Aucker had moderate difficulty in the ability to maintain concentration, persistence or pace at all times after the alleged onset date. Tr. 15.

At step three of the sequential evaluation process the administrative law judge found that Aucker's impairments did not individually or in combination meet or equal a listed impairment. Tr. 15. The administrative law judge specifically addressed

---

33. The Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision, at page 740 describes BIF in relevant part as follows: "This category can be used when the focus of clinical attention is associated with borderline intellectual functioning, that is, an IQ in the 71-84 range."

Listing 12.05C and found that Aucker did not meet the requirements of that listing because Dr. Jonas, the state agency psychologist, found that Aucker's intelligence was consistent with Borderline Intellectual Functioning rather than mild mental retardation. Tr. 16.

In addressing step four of the sequential evaluation process in his decision, the administrative law judge found that Aucker had the residual functional capacity to perform the physical demands of work at all exertional level but with certain mental limitations. Tr. 18.  Aucker retained the mental capacity to understand, remember, and carry out simple, one to two step instructions, and to tolerate occasional interaction with coworkers, supervisors, and the general public; he can adapt to occasional changes in the work setting with regard to processes and products; he is unable to perform work requiring complex decision making or the exercise of more than simple judgment; and he possesses the capacity to stay on task for at least 90 percent of the workday on a regular and continuing basis. Tr. 18.  In setting this residual functional capacity the administrative law judge considered Aucker's credibility, past work and his activities of daily living, and the medical records and the opinion of the treating psychiatrists Dr. Qamar and Dr. Idoniboye, including their GAF scores of 60 representing moderate symptoms,  as well as the opinions of the consultative examiners Dr. Brink and Dr. Emery. Tr. 18-21.  The administrate law judge gave great weight to the opinion of the state agency psychologist Dr. Jonas who opined that Aucker had the mental capacity to perform his past relevant work as an asphalt laborer. Tr. 19.

The administrative law judge had to consider Aucker's reported symptoms and subjective complaints in light of the objective medical facts in the record and if his

subjective complaints were not substantiated by the objective medical evidence the administrative law judge was required to make a finding as to the credibility of his complaints.  The administrative law judge found that Aucker's statements concerning the intensity, persistence and limiting effects of his impairments were not credible to the extent that they were inconsistent with his ability to engage in the work as described above. Tr. 19.  The administrative law judge based on the above described residual functional capacity and the testimony of a vocational expert found that Aucker could perform his past relevant work as an asphalt laborer. Tr. 21.  The administrative law judge stated that he accepted the testimony of the vocational expert that Aucker's current residual functional capacity "does not preclude the full-time performance of the physical demands and mental demands of an asphalt laborer." Id.  Consequently, the administrative law judge concluded that Aucker was not disabled.

       The administrative record in this case is 272 pages in length and we have thoroughly reviewed that record.  The administrative law judge did an excellent  job of reviewing Aucker's vocational history and medical records in his decision. Tr. 12-22.  Furthermore, the brief submitted by the Commissioner sufficiently reviews the medical and vocational evidence in this case. Doc. 14, Brief of Defendant.

       Aucker argues that the administrative law judge erred  (1) by  failing to find at step three of the sequential evaluation process that his impairments met or equaled a listed impairment, specifically Listing 12.05C and (2) by failing to adequately reflect Aucker's difficulties with concentration, persistence or pace in the hypothetical question asked of the vocational expert.  Based on our review of the record, we find no merit in Aucker's arguments.

If Aucker's severe impairments met or equaled a listed impairment, he would have been considered disabled per se and awarded disability benefits. However, a claimant has the burden of proving that his or her severe impairment or impairments meet or equal a listed impairment. Sullivan v. Zebley, 493 U.S. 521, 530 (1990); 20 C.F.R. § 1520(d) and § 416.920(d). To do this a claimant must show that all of the criteria for a listing are met or equaled. Id. An impairment that meets or equals only some of the criteria for a listed impairment is not sufficient. Id. Furthermore, the Commissioner's Listings contemplate that findings satisfying the required criteria will be consistently documented over a period of time, not just on isolated examinations. 20 C.F.R., pt. 404, subpt. P, app. 1, § 1.00D ("Because abnormal physical findings may be intermittent, their presence over a period of time must be established by a record of ongoing management and evaluation."); id. §1.00H(1)("Musculoskeletal impairments frequently improve with time or respond to treatment; [t]herefore, a longitudinal clinical record is generally important for the assessment of severity and expected duration of an impairment . . . .").

The determination of whether a claimant meets or equals a listing is a medical one. The Social Security regulations require that an applicant for disability insurance benefits come forward with medical evidence "showing that [the applicant] has an impairment(s) and how severe it is during the time [the applicant] say[s] [he or she is] disabled" and "showing how [the] impairment(s) affects [the applicant's] functioning during the time [the applicant] say[s] [he or she is] disabled." 20 C.F.R. § 404.1512(c). Consequently, a claimant must present medical evidence or opinion that his or her impairment meets or equals a listing.

27

Aucker's argument is premised on the contention that he met or equaled the requirements of Listing 12.05C, Intellectual disability or mental retardation. The court has already addressed the criteria/requirements of that listing. In summary, Aucker had to establish that he had an IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. He also had to meet the requirement of the introductory paragraph to 12.05. Specifically, he had to demonstrate deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.[34] Deficits in adaptive functioning refer to "adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)(1).

Initially, it should be noted that no treating or examining physician has opined that he met the requirements of Listing of 12.05C. Second, there is no credible evidence that Aucker met the requirement of 12.05C that he demonstrate deficits in

---

34. Aucker in his brief has argued based on the case of Markle v. Barnhart, 324 F.3d 182 (3d Cir. 2003) that the showing of deficits in adaptive functioning prior to age 22 is not a requirement of Listing 12.05C. This argument is devoid of merit. In Markle the Court of Appeals for the Third Circuit reversed the district court's affirmance and remanded the to the Commissioner because the administrative law judge did not address whether or not the claimant met the requirements of the introductory paragraph as well as subsection C. Id. at 187. Furthermore, in Markle there was evidence of a Full Scale IQ score of 70 and no substantial evidence to reject that score. Id. In contrast in the present case there is evidence from Dr. Qamar that Aucker had average intelligence, i.e., an IQ of 100, and from Dr. Jonas that Aucker's IQ was in the 71 to 84 range. Also, in Markle the claimant "performed no work during the fifteen years prior to his SSI application." Id. at 183.

28

adaptive functioning prior to age 22.   Dr. Jonas found that Aucker had no restrictions in activities of daily living and only moderate difficulties in maintaining social functioning and concentration, persistence or pace.  Tr. 75.  Moderate as mentioned earlier does not preclude a individual from functioning satisfactorily.  Third, Dr. Jonas opined that Aucker did not meet the requirement of Listing 12.05C. Id.  It was clearly appropriate for the administrative law judge to rely on Dr. Jonas's opinion.  See Chandler v. Commissioner of Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011)("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]").

Furthermore, the initial evaluation of Aucker by Dr. Qamar in December, 2010,  indicates that Aucker had average intelligence.  That in itself is substantial evidence supporting the administrative law judge conclusion that Aucker did not meet listing 12.05C.  The administrative law judge did not have to accept the low IQ score found by Dr. Brink in September, 2008.

Aucker has proffered no medical opinion, nor has he marshaled the evidence in the record, to support his contention that his condition met or equaled the requirements of Listing 12.05C.  The administrative law judge gave an adequate explanation for finding that Aucker did not meet or equal the criteria of a listed impairment.  The court cannot concluded from the bare medical records that Aucker met the requirements of Listing 12.05C.

Aucker's second argument is that the administrative law judge should have included in the hypothetical question asked of the vocational expert a statement that Aucker was moderately limited in concentration, persistence and pace. We are a

29

satisfied that the question asked of the vocational expert adequately reflected such limitation.   The administrative law judge properly found that although Aucker had severe impairments, he maintained the capacity to perform work at all exertional levels with additional limitations of performing only simple tasks; occasional interaction with coworkers, supervisors, and the general public; and occasional changes in the work setting. Tr. 18.  The administrative law judge noted in his decision at step three that his assessment of Aucker's moderate limitation with respect to concentration, persistence and pace was not a residual function assessment but only used to rate the severity of the mental impairment at steps 2 and 3 and that the mental residual functional capacity developed at step 4 would address and cover the moderate limitation in concentration, persistence and pace.  Tr. 18.  At step four the administrative enumerated those limitations as mentioned above: (1) only simple tasks; (2) occasional interaction with coworkers, supervisors, and the general public; and (3) occasional changes in the work setting.  Consequently, the administrative law judge appropriately took into consideration all of Aucker's possible limitations, including those that may have resulted from any difficulties with concentration.  It is important to note, that Aucker only had a moderate limitation in concentration, persistence and pace and as stated a "moderate" limitation is defined as one that does not preclude an individual from performing satisfactorily. Furthermore, as stated earlier, Dr. Jonas found that Aucker had a moderate limitation in concentration, persistence and pace but still concluded that Aucker could perform his past relevant work as an asphalt laborer.

No  treating physician or psychiatrist submitted a functional assessment of Aucker which indicated that he was functionally impaired from a mental standpoint (such

that he could not perform his past relevant work)  for the requisite continuous 12 month period.[35]   In contrast Dr. Jonas's opinion supports the ALJ's finding that Aucker could perform his past relevant unskilled work as an asphalt laborer.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence.  We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.

Robert D. Mariani
United States District Judge


Date: November _____ , 2014


---

35.   To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A).